SACK, Circuit Judge, concurring:

I fully concur in Judge Lynch's opinion for the Court. I nonetheless take the liberty of offering several additional observations about the import of today's decision.

Because our decision is based on our reading of a federal statute, not the Constitution, Congress can in effect overrule it. The enactment of a statute amending or supplanting the portion of section 215 that, until now, has been interpreted to authorize the NSA's bulk collection program would likely do the job, subject, of course, to a subsequent constitutional challenge in the courts.

Alternatively, Congress might simply terminate the program. Recent news dispatches indicate that it is considering doing just that.[1] And the plaintiffs have suggested that their grievance could be addressed by a statutory amendment

---

[1] *See* Jonathan Weisman & Jennifer Steinhauer, *Patriot Act Faces Curbs Supported by Both Parties*, N.Y. Times, May 1, 2015, at A1; *see also, e.g.,* Ellen Nakashima, *With Deadline Near, Lawmakers Introduce Bill to End NSA Program*, Wash. Post, Apr. 28, 2015, http://www.washingtonpost.com/world/national-security/with-deadline-near-lawmakers-introduce-bill-to-end-nsa-program/2015/04/28/8fd1cf6e-edb4-11e4-a55f-38924fca94f9_story.html; Spencer Ackerman, *NSA Reform Bill Imperilled as it Competes with Alternative Effort in the Senate*, The Guardian, Apr. 28, 2015, http://www.theguardian.com/us-news/2015/apr/28/house-nsa-reform-bill-senate-usa-freedom-act; H.R. 1466, 114th Cong. (2015).

replacing the bulk collection program with an arrangement under which the telephone companies will retain the metadata in question, subject to valid government subpoenas.  *See* Argument Tr. at 7-8 (Sept. 2, 2014) (statement by counsel for the appellant); Jonathan Weisman & Jennifer Steinhauer, *Patriot Act Faces Curbs Supported by Both Parties*, N.Y. Times, May 1, 2015, at A1 (reporting that, under "bipartisan bills in the House and Senate, the Patriot Act would be changed to prohibit bulk collection . . . .  The data would instead be stored by the phone companies themselves, and could be accessed by intelligence agencies only after approval of the" Foreign Intelligence Surveillance Court).

In any event, as Judge Lynch's opinion makes clear, it is Congress's prerogative, not ours, to resolve the conflict underlying these issues in the first instance.  *Ante* at 7, 90.

In that connection, Judge Lynch's opinion refers to "the primary role that should be played by [Congress] in deciding, explicitly and after full debate, whether such programs [as those pursuant to which the NSA has collected telephone metadata] are appropriate and necessary."  *Ante* at 92.  I agree.  I think it nonetheless appropriate to pause to ensure that that statement is not read to devalue or minimize the role of the courts in determining the meaning of any

such legislation, its future application to particular acts or practices of the federal government and others, or its propriety under the Constitution. The courts are charged with the responsibility of making those judgments. They are, as an institution, tasked with the duty, in the context of cases or controversies properly brought before them, to seek to reconcile the never completely reconcilable tension between the individual's interest in privacy and right to civil liberties and the government's duty to protect American lives and property.[2]

The role of Congress under Article I of the Constitution and that of the courts under Article III, "in the face of the concerns about the reasonableness of the [] assertions [by the Executive Branch under Article II] of the necessity of the data collection," *ante* at 90, are, moreover, not entirely independent from one another. Congress has for more than thirty-five years looked to the Foreign Intelligence Surveillance Court (the "FISC"), first established for such matters under the Foreign Intelligence Surveillance Act of 1978 ("FISA"), to adjudicate cases and controversies arising out of the application and administration of the Act. *See ante* at 6.

---

[2] The writer has expressed general views on the subject elsewhere. *See* Robert D. Sack, *Speech: Judicial Skepticism and the Threat of Terrorism,* 31 W. New Eng. L. Rev. 1 (2009) (adapted from Law Day speech before the Federal Bar Council, New York City, May 1, 2008).

3

The FISC, like the quotidian federal district courts and courts of appeals, is established under Article III of the Constitution.[3] But because of its specialized role dealing with matters touching on national security concerns, it conducts its proceedings differently. Two of the fundamental characteristics of ordinary Article III courts that are often considered central to their mission are transparency ("openness") and a properly functioning adversary system. Neither transparency nor a true adversary system characterizes the operation of the FISC.

Thus, most Article III courts, including this Court, operate under a strong presumption that their papers and proceedings are open to the public. *See, e.g., Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 571-72 (1980).

> The value of openness lies in the fact that people . . . can have confidence that standards of fairness are being observed; the sure knowledge that anyone is free to attend gives assurance that established procedures are being followed and that deviations will become known. Openness thus enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system.

*Press-Enterprise Co. v. Superior Court of Cal.*, 464 U.S. 501, 508 (1984) (emphasis omitted). "People in an open society do not demand infallibility from their

---

[3] "The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." U.S. Const., Art. III, § 1.

4

institutions, but it is difficult for them to accept what they are prohibited from observing." *Richmond Newspapers, Inc.*, 448 U.S. at 572.[4]

The FISC, by contrast, operates largely behind closed doors. While it may do so at the cost of some public confidence, the court's ability to do otherwise would appear to be, at best, limited. Information cannot simultaneously be kept secret and made public at the same time – at least not this side of quantum physics.[5]

This conundrum is not unique to the FISC – it confronts any Article III court addressing what purports to constitute state secrets or other information the confidentiality of which is protectable by law. *See, e.g.*, *United States v. Reynolds*, 345 U.S. 1 (1953) (setting forth the method for judicial consideration of

---

[4] The Supreme Court's case law has been developed largely in the context of criminal cases. It likely also applies to civil proceedings. *See, e.g.*, *Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 91 (2d Cir. 2004) (applying principles of First Amendment rights of access to federal courts to conclude that there is a "qualified First Amendment right to inspect [civil] docket sheets, which provide an index to the records of judicial proceedings"); Marc A. Franklin, et al., *Mass Media Law: Cases and Materials* 596 (8th ed. 2011) ("The Supreme Court has not decided whether there is a constitutional right of access to civil trials, but lower courts have assumed that the First Amendment right to attend civil trials is at least as strong as the right to attend criminal trials." (citing, *inter alia*, *Westmoreland v. CBS*, 752 F.2d 16, 23 (2d Cir. 1984); *Publicker Industries, Inc. v. Cohen*, 733 F.2d 1059 (3d Cir. 1984))).

[5] To be sure, there may be aspects of FISC operations that simply do not warrant secret treatment. *Cf.* Weisman & Steinhauer, *supra* (reporting that proposed congressional legislation would require the declassification of all significant FISA court opinions). I doubt, though, that in light of the likely scope of these exceptions, they materially affect my overall observations about *in camera* FISC proceedings.

5

civil cases touching on state secrets); *United States v. Stewart*, 590 F.3d 93, 125-32 (2d Cir. 2009) (describing at length the methods employed when a criminal defendant in federal district court seeks FISA documents); *Doe v. CIA*, 576 F.3d 95 (2d Cir. 2009) (civil) (describing this Court's manner of conducting an appeal involving state secrets). In such cases, courts typically operate publicly only to the extent they think practicable after evaluating the basis of the government's purported need for secrecy and the effects of such secrecy on the other parties before them.

The absence of a robust adversary system in the FISC may be another matter. It requires little beyond the common experience of bench and bar to establish the general importance to courts and the parties before them of hearing from all sides of a dispute. The Supreme Court has recognized that:

> Adversary proceedings are a major aspect of our system of criminal justice. Their superiority as a means for attaining justice in a given case is nowhere more evident than in those cases, such as the ones at bar, where an issue must be decided on the basis of a large volume of factual materials, and after consideration of the many and subtle interrelationships which may exist among the facts reflected by these records. As the need for adversary inquiry is increased by the complexity of the issues presented for adjudication, and by the consequent inadequacy of ex parte procedures as a means for their accurate resolution, the displacement of well-informed advocacy necessarily becomes less justifiable.

*Alderman v. United States*, 394 U.S. 165, 183-84 (1969).

Considering the issue of advocacy in the context of deliberations involving alleged state secrets, and, more broadly, the "leak"[6] by Edward Snowden that led to this litigation,[7] calls to mind the disclosures by Daniel Ellsberg that gave rise to the legendary "Pentagon Papers" litigation.[8]  The district court and court of appeals stages of the Pentagon Papers case unfolded in this courthouse some forty-four years ago.  *United States v. New York Times Co.* (the "Pentagon Papers" case), 328 F. Supp. 324, 333 (S.D.N.Y.) (Gurfein, J.), *remanded*, 444 F.2d 544 (2d

---

[6] I use quotation marks around the term "leak" for reasons adverted to in *New York Times Co. v. Gonzales*, 459 F.3d 160 (2d Cir. 2006) (Sack, J., dissenting):

> [T]he use of the term "leak" to identify unauthorized disclosures in this context may be unhelpful.  It misleadingly suggests a system that is broken.  Some unauthorized disclosures may be harmful indeed.  But others likely contribute to the general welfare . . . .  Secretive bureaucratic agencies, like hermetically sealed houses, often benefit from a breath of fresh air.

*Id.* at 183 (Sack, J., dissenting) (footnotes omitted).

[7] The complaint was filed about one week after and based on the disclosure.  *See ACLU v. Clapper*, No. 11-cv-7562, DI 1 (Complaint).  Although the "leak" led to this litigation, our decision is not about the Snowden disclosures themselves nor should the significance of our rather complex analysis of the statute be confused with the significance *vel non* of the security breach or the NSA telephone metadata program.

[8] A "Lexis" search conducted by the writer on April 29, 2015 disclosed more than 40 articles comparing the two sets of unauthorized disclosures in "Major Newspapers," including *The Los Angeles Times*, *The Hartford Courant*, *The Globe and Mail (Canada)*, *The Boston Globe*, *The San Francisco Chronicle* and *The Seattle Times*.  A further such "Lexis" search of *The New York Times* also found multiple examples.  *See also*, Jonathan Capehart, *Snowden Is No Daniel Ellsberg*, Wash. Post, July 2, 2013, at A15 ("I pleaded last month for an end to the breathless comparisons between Edward Snowden and Daniel Ellsberg.").

Cir.) (*en banc*) (per curiam), *rev'd*, 403 U.S. 713 (1971) (per curiam).  The issues in that case, like the concerns that led to the deliberations of the Church Committee, and then to FISA's enactment and the creation of the FISC, arose, as Judge Lynch puts it, during "the early 1970s, in a climate not altogether unlike today's."  *Ante* at 5.  His observation is reminiscent of Judge Gurfein's somber contemporary dictum about the same era:  "These are troubled times."  *Pentagon Papers*, 328 F. Supp. at 331.

The disclosures, the national security issues, and the challenges facing the Pentagon Papers district court and the FISC are different.  There is, however, at least one aspect of the Pentagon Papers cases that may be instructive here.

The FISC's hearings are, as noted, held *ex parte*.  The targets of their proceedings are ordinarily not represented by counsel.  (Indeed it seems likely that targets are usually unaware of the existence of the proceedings or their subject.)  In the Pentagon Papers case, the court held a hearing, part in public and part *in camera*, to determine the facts of the case and the whether further publication of the papers would endanger legitimate national security interests.  In both the open *and* closed portions of the hearing, *The New York Times* enjoyed the assistance of highly competent counsel.  The *Times* and its counsel already

had access to the material that the government was attempting to keep from further public view; barring their presence in the otherwise closed hearing room would not have advanced the legitimate security interests of the United States. Their attendance at the hearing apparently turned out to be pivotal.

During the public portion of the hearing, there was little indication that Judge Gurfein was sympathetic to the *Times'* position that further publication of the Papers, which were marked classified, was constitutionally protected or otherwise permissible. *See* David Rudenstine, *The Day the Presses Stopped: A History of the Pentagon Papers Case* 107-52 (1996). As the public portion of the hearing closed, "the government had reason to be confident that it would prevail, and the *Times* lawyers could take very little comfort from what had so far occurred." *Id.* at 152.

It was only upon the *Times'* cross-examination of the first witness in the subsequent closed-door hearing, in which the *Times'* counsel focused relentlessly on what, specifically, in the Papers would present a threat to the United States if disclosed and why, that Judge Gurfein's apparent leaning began to shift towards the position of the *Times*. *Id.*; *see also* James C. Goodale, *Fighting for the Press: The Inside Story of the Pentagon Papers and Other Battles* 105-07 (2013) (describing the

participation of counsel for the *Times* at the closed-door hearing). The Judge's own questioning of the witnesses[9] evinced his emerging acceptance of the *Times'* position and his embrace of the nature of the government's burden. Only after hearing extensive argument, examination, and cross-examination, from both sides, did Judge Gurfein conclude: "I am constrained to find as a fact that the in camera proceedings at which representatives of the Department of State, Department of Defense and the Joint Chiefs of Staff testified, did not convince this Court that the publication of these historical documents would seriously breach the national security." *Pentagon Papers*, 328 F. Supp. at 330. By common, if not universal, consensus, the district court's conclusion that the publication of the Papers by the *Times* would not "involve a serious security danger," informed

---

[9] By happy coincidence, also contributing to the ability of the district court effectively to address the issue of the national security implications of further publication was the fact that Judge Gurfein had spent four years in World War II and after as an officer, rising to the rank of Lieutenant Colonel in the O.S.S. (Office of Strategic Services). *See Biographical Directory of Federal Judges – Gurfein, Murray Irwin*, Federal Judicial Center, http://www.fjc.gov/servlet/nGetInfo?jid=930&cid=999&ctype=na&instate=na (last visited April 30, 2015). The O.S.S. was the predecessor of the Central Intelligence Agency. *See History of the CIA*, Central Intelligence Agency, https://www.cia.gov/about-cia/history-of-the-cia/index.html (last visited April 30, 2015); *see also* Goodale, *supra* at 101 (describing Judge Gurfein's use of his intelligence background during the hearing).

Notably, the possibility of giving the FISC improved access to relevant expertise is reflected in currently proposed legislation. *See* Weisman & Steinhauer, *supra* ("The legislation would . . . create a panel of experts to advise the FISA court on privacy, civil liberties, and technology matters . . . .").

as it was by the participation of legal representatives of all parties, was right.[10]

It may be worth considering that the participation of an adversary to the government at some point in the FISC's proceedings could similarly provide a significant benefit to that court. The FISC otherwise may be subject to the understandable suspicion that, hearing only from the government, it is likely to be strongly inclined to rule for the government. And at least in some cases it may be that its decision-making would be improved by the presence of counsel opposing the government's assertions before the court. Members of each branch of government have encouraged some such development.[11]

---

[10] *See* Rudenstine, *supra*, at 326-29. Some years later, Erwin Griswold, who, as the United States Solicitor General, argued the case in the Supreme Court, conceded as much. He wrote, "I have never seen any trace of a threat to the national security from the publication [of the Papers]. Indeed, I have never seen it even suggested that there was such an actual threat." Erwin N. Griswold, *Secrets Not Worth Keeping: The Courts and Classified Information*, Wash. Post, Feb. 15, 1989, at A25. He further observed: "It quickly becomes apparent to any person who has considerable experience with classified material that there is massive overclassification and that the principal concern of the classifiers is not with national security, but rather with governmental embarrassment of one sort or another." *Id.*

[11] They include President Obama, Transcript of President Obama's Jan. 17 Speech on NSA Reforms, Wash. Post, Jan. 17, 2014, http://www.washingtonpost.com/politics/full-text-of-president-obamas-jan-17-speech-on-nsa-reforms/2014/01/17/fa33590a-7f8c-11e3-9556-4a4bf7bcbd84_story.html, judges who previously served on the FISC, *see* Charlie Savage, *Nation Will Gain by Discussing Surveillance, Expert Tells Privacy Board*, N.Y. Times, July 10, 2013, at A16; Judge James G. Carr, *A Better Secret Court*, N.Y. Times, July 23, 2013, at A21, and some members of Congress, *see* FISA Court Reform Act of 2013, H.R. 3228, 113th Cong. (2013); The U.S.A. Freedom Act, H.R. 2048, 114th Cong. (2015).

Having said all that, I reiterate that we do not assert any institutional capability to provide, recommend, or in the absence of a case or controversy, pass on the propriety of FISC's deliberations. As Judge Lynch's opinion makes clear, it is Congress that must decide in the first instance under what circumstance the government can obtain data touching upon conflicting national security and personal privacy interests.

Recognition of the dangers to the fundamental rights of citizens that inevitably arise when the nation attempts effectively to treat grave external threats to lives and property was not dependent on the creation of telephone metadata or the preparation of secret reports on the origin of the Vietnam War. It is as old as the Republic.

> Safety from external danger is the most powerful director of national conduct. Even the ardent love of liberty will, after a time, give way to its dictates. The violent destruction of life and property incident to war, the continual effort and alarm attendant on a state of continual danger, will compel nations the most attached to liberty to resort for repose and security to institutions which have a tendency to destroy their civil and

---

*But see* Letter from Hon. John D. Bates, Director, Admin. Office of the U.S. Courts, to Hon. Dianne Feinstein, Chairman, Select Comm. on Intelligence, U.S. Senate (Jan. 13, 2014) (arguing that "[t]he participation of a privacy advocate is unnecessary—and could prove counterproductive—in the vast majority of FISA matters, which involve the application of a probable cause or other factual standard to case-specific facts and typically implicate the privacy interests of few persons other than the specified targets").

> political rights.  To be more safe, they at length become willing to run the risk of being less free.

The Federalist No. 8 (Alexander Hamilton).  We judges have an often critical part to play in resolving these issues, but only by addressing them in individual cases, according to the law and Constitution, and as best we can.